IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LYNN FRANKLIN | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 05-2215 |
| | : | |
| v. | : | |
| | : | |
| JO ANNE B. BARNHART, | : | |
| Commissioner of Social Security | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

Giles, J.                                                                                          June 13, 2006

**I.      Introduction**

Lynn Franklin brings this action pursuant to 42 U.S.C. § 405(g) for review of the final

decision of the Commissioner of Social Security who denied her application for Social Security

Disability Benefits and Supplemental Security Income payments for the period between October

27, 1998 and January 14, 2003.  The parties have filed cross motions for summary judgment.  For

the foregoing reasons, the court grants Franklin's motion for summary judgment for disability

benefits between October 27, 1998 and January 14, 2003.

**II.      Procedural History**

Franklin filed an application for Disability Insurance Benefits on June 19, 2000 alleging

that she had been disabled since October 27, 1998.  A hearing was held on May 22, 2001 before

an Administrative Law Judge ("ALJ").  On April 23, 2001, the ALJ issued a written decision

concluding that Franklin was not disabled.  Franklin appealed the decision to the Social Security

Appeals Council which granted review and remanded the case with instructions on September

12, 2003.

On September 24, 2003, Franklin filed new, concurrent applications for both Disability

Insurance Benefits and Supplemental Security Income payments.  A hearing was held on March

31, 2004 before the previous ALJ.  On April 26, 2004, the ALJ determined that Franklin was

disabled since January 14, 2003, but not prior thereto.  Franklin again sought review by the

Appeals Council, which appeal was denied on April 14, 2005.  Franklin filed the present action

on May 10, 2005 seeking a determination that she was disabled between October 27, 1998 and

January 14, 2003.


III.    **Factual Background**

A.      Right Shoulder

On October 27, 1998, while a manager for 7-11, Franklin fell injuring her right shoulder.

On November 2, 1998, Franklin began seeing Dr. Hamilton.  Initially Dr. Hamilton diagnosed

rotator cuff tendonopathy with a small fold thickness tear and prescribed physical therapy.  (Tr.

250).  Franklin attempted to return to work on December 7, 1998, but found that she experienced

too much pain.  (Tr. 140).  After determining that physical therapy was not significantly

decreasing her shoulder pain, Franklin and Dr. Hamilton decided on surgery.  (Tr. 248).  On

February 4, 1999, Franklin underwent an arthroscopy and acomioplasty which diagnosed rotator

cuff tendinitis of the right shoulder.  (Tr. 198).

After the surgery Franklin began seeing Dr. Dearolf who monitored her recovery.  After

several months of physical therapy, Dr. Dearolf found slow improvement given Franklin's continuing pain and weakness in Franklin's shoulder.  (Tr. 247).  From March 1999 until July 1999 Dr. Dearolf noted Franklin's slow progress and in particular her difficulty lifting.  (Tr. 245-247).  On good days Franklin was able to lift from three to four pounds (Tr. 247), but on other days could not even lift one pound.  (Tr. 245).  As a result of Franklin's slow progress an MRI was performed on July 29, 1999 revealing a full rotator cuff tear of the right shoulder.  (Tr. 237).  On August 19, 1999, Franklin underwent an open rotator cuff repair of her right shoulder.  (Tr. 200).  After the surgery Franklin began taking Percocet for the pain, which she continued until January 2000.  (Tr. 244, 241).  Franklin returned to physical therapy, but continued to experience pain and weakness in her right shoulder.  (Tr. 242-44).

On December 7, 1999, Franklin attempted to return to work for the second time, but once again quit given pain in her right shoulder.  (Tr. 140).  Dr. Dearolf noted that her pain appeared to intensify after she returned to work and that "she may have just overdone it."  (Tr. 241).  On December 13, 1999, Franklin reported to Dr. Dearolf that she was having more and more pain and that she was experiencing more pain than before the surgery.  (Tr. 242).  Dr. Dearolf continued to monitor Franklin, consistently noting slow progress in her physical recovery due to persistent pain and weakness in her right shoulder.  (Tr. 239-242).  At no time did Dr. Dearolf find that Franklin could lift any amount of weight.

On April 14, 2000, Dr. Michael Okin, M.D., provided an independent medical evaluation for Franklin.  In this evaluation, Dr. Okin found that Franklin could neither lift nor carry 0-10 lbs. (Tr. 220).  On July 17, 2000, in response to continued pain in her shoulder Dr. Dearolf injected Franklin's acromioclavicular joint with Marcaine and Xylocaine.  (Tr. 239).

-3-

On October 26, 2000, Franklin had a third surgery on her right shoulder.  (Tr. 356).  After the surgery, Franklin was given Percocet for her pain.  (Tr. 356).  From November 2000 until December 2003 Dr. Dearolf monitored Franklin's progress.  (Tr. 356-59, 513-26).  During this time, Dr. Dearolf's treatment notes confirm that Franklin continually used Percocet for her shoulder pain requiring frequent renewals from Dr. Dearolf.  (Tr. 356-59, 513-26).  During these three years Franklin's prognosis remained unchanged.  At each visit Dr. Dearolf noted pain and weakness in Franklin's right shoulder.  (Tr. 356-59, 513-26).

Franklin discussed her continued use of Percocet with her family physician, Dr. Most-Levin, who spoke with her about Percocet's side effects.  (Tr. 564).  Dr. Most-Levin's treatment notes after her second shoulder operation document Franklin's struggle with continued pain in her right shoulder.  (Tr. 564).  Specifically, in October 2001 Franklin attempted to stop taking Percocet for two weeks, but restarted it because she found when she was on it she was "not so overwhelmed thinking about pain."  (Tr. 560).  Franklin told Dr. Most-Levin that she was "sick of it–sick of being in pain all the time."  (Tr. 560).  On December 20, 2001, Franklin again told Dr. Most-Levin that she was "tired of shoulder pain" and Dr. Most-Levin noted that Franklin was suffering from Chronic Pain Syndrome.  (Tr. 558).  On March 28, 2002, Franklin told Dr. Most-Levin that she couldn't get by without the Percocet and that it "helps."  (Tr. 555).  On October 21, 2002, Dr. Most-Levin noted that Franklin was taking 1-3 Percocet per day and that she reported going through a bad time with her shoulder.  (Tr. 549).  Again, on November 25, 2002, Franklin told Dr. Most-Levin that she was experiencing a lot of shoulder pain and that she was "taking lots of Percocet."  (Tr. 547).

Despite the constant use of Percocet, Franklin still experienced pain in her right shoulder.

-4-

On March 20, 2001, March 26, 2001, May 21, 2001, August 27, 2001, December 10, 2002, and December 23, 2002, Franklin was given a Medrol Dosepak to help manage her pain.  (Tr. 358, 526, 524, 518).  Franklin also began the use of a TENS unit in April 2001.  (Tr. 526).

After Franklin's second surgery, there is no medical evidence that Franklin was able to lift any amount of weight.  Additionally, on October 29, 2001, after Franklin was initially denied disability benefits, Dr. Dearolf provided a letter to Franklin's attorney expressing his disagreement with the ALJ's findings.  (Tr. 500-01).  Dr. Dearolf explained that Franklin was severely limited in the use of her right arm and that in his opinion there was no job that Franklin could perform given her limitations.  (Tr. 500).  His treatment notes reflect his opinion that Franklin was unable to return to work, given the limitations in her right shoulder.  For example, on June 3, 2002, Dr. Dearolf had written in his office notes, after a long discussion with Franklin, "I don't think she is going to be able to be getting back to doing any significant work with her right upper extremity.  I think this is on a permanent basis at this point."  (Tr. 520).

At the March 31, 2004 ALJ hearing Franklin spoke about the pain in her shoulder and the side effects of her medication.  Franklin explained to the ALJ that after the second surgery the "pain was excruciating."  (Tr. 611).  Franklin explained that since her final surgery in 2000 she found that physical therapy did not make a difference because "[i]f you don't move it, it hurts, if you do move it, it hurts."  (Tr. 611-12).  When asked about the use of her TENS unit, Franklin said that although it distracted her from the pain, it did not make her pain go away.  (Tr. 613).

Franklin also testified about the side effects of Percocet.  Franklin stated that "[t]he pain medication puts me in a cloud."  (Tr. 609).  She added that she had hoped to find new medication which would "calm me down, maybe, and not knock me out" because "I just feel like take the

pills and a couple hours later it's like makes it go away but it makes you go to sleep. That's not living." (Tr. 609).

Franklin had described the same symptoms on her June 26, 2000 application for disability benefits. She explained that the Percocet was making her sleepy and clouding her head. (Tr. 150). Franklin stated, "I feel the pain medication clouds my thinking, but then again I need to take it." (Tr. 152).

Her description of the Percocet side effects was corroborated by Dr. Dearolf's October 29, 2001 letter to Franklin's attorney in which he noted Franklin's use of significant pain medication and its effects on her ability to concentrate and perform necessary job functions. (Tr. 500).

B.   <u>Depression</u>

Since October 27, 1998, Dr. Most-Levin, Franklin's primary physician, has detailed her history of depression, both before and after her fall and resulting shoulder injury. During a visit on April 25, 1997, Dr. Most-Levin recorded that Franklin had had a nervous breakdown in the early 1980's which required a month of hospitalization at Friend's Hospital. (Tr. 422). Franklin reported that she cried all day and was prescribed 20 mg of Prozac with three refills. (Tr. 422). Dr. Most-Levin's treatment notes do not refer to depression again until after Franklin's fall in October 1998. On December 3, 1998, Dr. Most-Levin met with Franklin and recorded that she was "tearful," "very upset–crying a lot" and "crying throughout [the] entire visit." (Tr. 404). Dr. Most-Levin prescribed Zoloft at 50 mg. (Tr. 404). On December 15, 1998, after Franklin called Dr. Most-Levin claiming that she could not tolerate Zoloft, Dr. Most-Levin changed the medication to Serzone. (Tr. 405). On January 26, 1999, Dr. Most-Levin met with Franklin and

-6-

learned from her that she had not begun using the Serzone.  (Tr. 405).  On April 27, 1999, Dr.

Most-Levin found Franklin crying throughout the visit and crying very easily.  (Tr. 402).  Dr.

Most-Levin again prescribed Serzone beginning with 50 mg dosages and increasing to 150 mg.

(Tr. 403).  On May 27, 1999, Dr. Most-Levin increased the dosage to 200 mg, the maximum

amount.  (Tr. 400).  Dr. Most-Levin counseled Franklin regarding her depression in addition to

prescribing anti-depressants.  (Tr. 385, 560, 565).

Franklin remained on 200 mg of Serzone until October 19, 2001.  (Tr. 400-01, 560-65).

On October 19, 2001, Dr. Most-Levin found that Franklin was "clearly depressed despite

Serzone."  (Tr. 560).  Dr. Most-Levin changed the medication to Celexa at 20 mg.  (Tr. 560).  On

December 20, 2001, Dr. Most-Levin increased her dosage to 40 mg Celexa, finding that she was

still crying during visits.  (Tr. 558-59).  On January 29, 2002, Dr. Most-Levin recorded that

Franklin was tearful and explained she did not feel that she was on the right medication.  It is

noted that she said, "I'm not doing well.  I'm not good.  Can't pick up the phone.  My life is

useless."  (Tr. 557).  Dr. Most-Levin discussed with her the option of seeking other psychological

help, but Franklin told Dr. Most-Levin that she did not wish to see a psychiatrist or go to the

hospital.  (Tr. 557).  Dr. Most-Levin at that time changed the medication to 100 mg of

Wellbutryn SB to see if it helped in relieving her depression.

Dr. Most-Levin found Franklin to be stable on Wellbutryn until the visit of September 26,

2002.  (Tr. 550-56).  Dr. Most-Levin found that she was crying in the waiting room and

throughout the visit.  (Tr. 550).  Dr. Most-Levin concluded that she was "very depressed" and

prescribed 75 mg of Effexor XR.  (Tr. 550, emphasis in original).  Franklin remained on Effexor

until January 6, 2003.  (Tr. 545-50).  At this visit, Franklin reported that the Effexor was not

helpful and that she did not want to come out of the house, felt completely non-functional, spent her days sitting on the sofa, and feeling empty.  (Tr. 545).  Dr. Most-Levin also noted that Franklin cried throughout their time together and that Dr. Most-Levin spent the entire appointment counseling Franklin.  (Tr. 545).  Given Franklin's aversion to Effexor, Dr. Most-Levin prescribed 25 mg of Paxil CR.  (Tr. 545).

At the hearing on March 31, 2004, Franklin and the ALJ discussed her depression. Franklin explained that when she said she was depressed she was referring to being "tearful, tearful.  There's days that I'm just–don't even want to get out of bed."  (Tr. 607).  Franklin told the ALJ that there were times when she just feels nothing and times when she found herself crying for no reason.  (Tr. 607).  When asked why she never went to see a psychiatrist, Franklin explained that it's "[b]ecause I'm just very comfortable with Dr. Most-Levin.  I've been seeing Dr. Most-Levin for years and I really have a problem with just talking to other doctors.  Its just does to have to sit and explain this all over again."  (Tr. 608).  Franklin continued that she was just comfortable with Dr. Most-Levin and had faith in her.  (Tr. 608).  At the hearing Franklin also described periods of time in which she did not want to get of bed and found herself not leaving her house for weeks.  (Tr. 610).

C.    Diverticulitis

Franklin has a history of diverticulitis.  She was hospitalized in 1997 and before.  (Tr. 460-66, 448).  Given this history, Franklin was followed closely by Dr. Most-Levin whenever she complained of abdominal pain or cramping and any difficulty with her bowel movements. Between the alleged onset date of October 28, 1998 and the disability date of January 23, 2003, the record reflects a number of episodes of mild diverticulitis accompanied by abdominal pain or

rectal bleeding.

On January 26, 1999, Dr. Most-Levin reported that Franklin's diverticulitis was "stable." (Tr. 402).  Several days later, on January 29, 1999, Franklin complained to her doctor about pain in her lower right side and diarrhea, causing fear that her diverticulitis had returned.  (Tr. 402).  Franklin was scheduled for a CT scan on February 1, 1999 and surgery on February 4, 1999.  (Tr. 402).  On February 1, 1999, a CT scan was performed revealing "thickening of the sigmoid colon wall which could be due to diverticulitis."  (Tr. 450).  Dr. William Hartz, who performed the scan, found that while the thickening "is likely due to diverticulitis," the diagnosis was not certain.  (Tr. 450).

On March 23, 1999, Franklin saw Dr. Steven Harper, complaining of abdominal pain and cramping.  (Tr. 448).  Dr. Harper performed an examination and determined that he would need to review her CT scan to determine whether her symptoms were the result of diverticulitis or irritable bowel syndrome.  (Tr. 448).  Dr. Harper scheduled Franklin for a colonoscopy and biopsies of the colon.  (Tr. 448).  In the interim, she was prescribed Levbid on a trial basis to see if it would alleviate her symptoms.  (Tr. 448).  On May 20, 1999, Dr. Harper performed the colonoscopy which "was remarkable for diverticulitis."  (Tr. 445).  Dr. Harper spoke with Franklin about dietary recommendations and gave her a prescription for Levbid to help if her abdominal symptoms returned.  (Tr. 445).

The next mention of Franklin's diverticulitis in the record is on April 11, 2000 when Dr. Most-Levin noted abdominal pain for the previous 10 days.  (Tr. 391).  Dr. Most-Levin noted Franklin's previous medical history of diverticulitis and questioned whether the recent symptoms were the result of "early mild diverticulitis."  (Tr. 391-92).  At their next visit on May 2, 2000,

Dr. Most-Levin inquired about Franklin's diverticulitis symptoms and found no abdominal pain. (Tr. 389).  Franklin told Dr. Most-Levin that she had been having a small amount of rectal bleeding although there was no finding during the examination.  (Tr. 389-90).  Dr. Most-Levin questioned whether the bleeding was a result of diverticulitis or possible hemorhoided bleeding. (Tr. 390).  Several days later, on May 19, 2000, Dr. Most-Levin saw Franklin and found that her bowels were now "fine" with no further bleeding or abdominal cramping.  (Tr. 388).  Dr. Most-Levin noted that Franklin was taking Levsinex for her abdominal cramping and that her diverticulitis was "improved."  (Tr. 387-88).

On August 11, 2000, Dr. Most-Levin referred Franklin to Dr. Harper for rectal pain.  (Tr. 385).  On August 18, 2000, Dr. Harper met with Franklin and found a small anal fissure and prescribed an anorectal cream.  (Tr. 430).

On November 30, 2000, Dr. Most-Levin's treatment notes indicate the Franklin was taking Levinsex, but there is no further discussion of any symptoms requiring the need for medication.  (Tr. 379).  On January 25, 2001, Franklin met with Dr. Most-Levin and reported that she was "very irritated" with a lot of abdominal pain.  (Tr. 377).  Dr. Most-Levin noted the possibility of diverticulitis and Franklin's use of Levinsex.  (Tr. 377-78).

Between January 2001 and October 2002 there is no mention in the record of Franklin experiencing abdominal pain or cramping although Dr. Most-Levin's treatment notes indicate the use of Levinsex on July 10, 2001 (Tr. 564), September 11, 2001 (Tr. 563), June 27, 2002 (Tr. 553), and September 26, 2002 (Tr. 550).

On October 21, 2002, Franklin met with Dr. Most-Levin and reported symptoms of right-side abdominal pain and diarrhea for the previous week.  (Tr. 549).  Dr. Most-Levin questioned

whether the cramping was due to diverticulitis.  (Tr. 549).  Dr. Most-Levin recommended that

Franklin go to the hospital, but Franklin declined stating that she preferred to use outpatient

medication to relieve her symptoms.  (Tr. 549).  Dr. Most-Levin prescribed Levinsex.  (Tr. 549).

At their next meeting on October 28, 2002, Dr. Most-Levin found that Franklin's symptoms were

"much better" and that she no longer experienced any abdominal pain.  (Tr. 548).  Franklin was

continued on her medication.  (Tr. 548).  By November 25, 2002, Dr. Most-Levin concluded that

Franklin's diverticulitis was "resolved clinically."  (Tr. 547).

From November 2002 until January 2003 there is no further notation of diverticulitis,

abdominal pain or cramping.

## IV.   Standard

### A.   Five-Step Analysis

To determine whether a plaintiff is disabled, an ALJ must follow the five-step sequential

analysis as set forth in 20 C.F.R. § 404.1520.  This analysis begins with the ALJ making

determinations as to whether Franklin has engaged in any substantial gainful activity since the

alleged onset date of October 27, 1998.  The record confirms that plaintiff has not engaged in any

substantial employment since October 1998.  (Tr. 24).  Second, the ALJ must determine whether

Franklin suffers from a severe medical impairment that limits her ability to work.  A severe

impairment is one that has more than a minimal effect on an individual's ability to perform basic

work related activities on a sustained basis.  20 C.F.R. § 404.1520(c).  The ALJ found that

Franklin had the following severe impairments:  "Right rotator cuff tendonitis, obesity, and

bilateral carpal tunnel syndrome."  (Tr. 24).

Next, an ALJ must assess if the impairment meets or equals the criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ found that Franklin did not have impairment that meets or equals the criteria of any listed impairment.  (Tr. 25).  Having found that Franklin's impairments were not severe enough to meet or equal one of the listed impairments, step four requires an ALJ to determine whether plaintiff had the residual functional capacity ("RFC") to perform her past relevant work.  The ALJ determined that prior to January 14, 2003 Franklin had the RFC to perform a wide range of light and sedentary work with lifting limited to 10 pounds occasionally.  (Tr. 27).

Finally, with the assistance of a vocational expert the ALJ determined that with Franklin's RFC and limitations there existed a significant number of light and sedentary semiskilled jobs in the national economy that she could perform.  (Tr. 30).

B.  Standard of Review

When a district court reviews the decision of the Commissioner, review is limited to the Commissioner's final decision.  42 U.S.C. § 405(g).  A denial of review by the Appeals Council of a decision by an ALJ constitutes a final decision which is ripe for review.  20 C.F.R. § 404.972; 20 C.F.R. § 416.1481.  After reviewing the decision of the Commissioner the court "may, under 42 U.S.C. § 406(g) affirm, modify or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for a rehearing."  Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984).

The court must affirm the Commissioner's decision if it is supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  Substantial evidence is "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion."

-12-

Consolidated Edison Co. v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938).  In this context,

substantial evidence is more than a mere scintilla, but may be somewhat less than a

preponderance of the evidence.  Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971).

If the decision is not supported by substantial evidence the court should award benefits

"when the administrative record of the case has been fully developed and when substantial

evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits."

Podedworny, 745 F.2d at 222.


**V.    Discussion**

   A.    The ALJ's Finding that Franklin Could Lift 10 Lbs Is Not Supported by
          Substantial Evidence

The ALJ's determination that Franklin retained the RFC to lift 10 lbs and therefore could

perform a number of light and sedentary work is not supported by substantial evidence.  In

reaching this conclusion the ALJ did not cite to any portion of the record.  Dr. Dearolf repeatedly

explained in his treatment notes that Franklin exhibited significant weakness in her right upper

extremity and nowhere does Dr. Dearolf find that Franklin could lift 10 lbs.  (Tr. 239-47, 356-59,

513-26)

The only possible support in the record for the ALJ's finding is the independent medical

examination of December 10, 2001 by Dr. Okin who checked off a box indicating that Franklin

could frequently lift 0-10 lbs.  (Tr. 537)  However, it is a "cardinal principle guiding disability

eligibility determinations [] that the ALJ accord treating physicians' reports great weight,

especially 'when their opinions reflect expert judgment based on a continuing observation of the

patient's condition over a prolonged period of time.'" Morales v. Apfel, 225 F.3d 310, 317 (3d

Cir. 2000) (citing Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)).  See also 20 C.F.R. §

404.1527.  The third circuit has explained that its

> decisions make clear that determination of the existence vel non of
> substantial evidence is not merely a quantitative exercise.  A single
> piece of evidence will not satisfy the substantially test if the
> [Commissioner] ignores, or fails to resolve, a conflict created by
> countervailing evidence.  Nor is evidence substantial if it is
> overwhelmed by other evidence–particularly certain types of
> evidence (e.g., that offered by treating physicians)–or if it really
> constitutes not evidence but mere conclusion.  Id. (quoting Kent v.
> Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).

Here, the ALJ failed to properly weigh and credit the findings of Franklin's treating

physician, Dr. Dearolf, regarding consistent weakness in her right shoulder.  The ALJ should

have given Dr. Dearolf's assessment controlling weight in light of the fact that Dr. Dearolf

followed Franklin as her treating physician for four years and consistently found problems with

strength in her right shoulder.  See 20 C.F.R. § 404.1527 (holding that the opinions of treating

physicians are to be given more weight, particularly if there has been a lengthy relationship of

frequent examinations and a consistency of medical opinion).

The treatment history shows unequivocally that due to Franklin's continued pain and

weakness in her right shoulder she could not lift 10 pounds or any weight on a sustained basis

and therefore could not perform any gainful employment and consequently was disabled.

   B.   The ALJ Improperly Rejected Franklin's Subjective Complaints of Pain

In reaching an RFC determination, the ALJ "must consider all the relevant evidence

before him" and "he must give some indication of the evidence which he rejects and his reason(s)

for discounting such evidence."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir.

2000).  Additionally, the "ALJ must give serious consideration to a claimant's subjective complaints of pain" and where medical evidence "support[s] a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence."  Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993) (quoting Carter v. R.R. Ret. Bd., 834 F.2d 62, 65 (3d Cir. 1986)).  See also 20 C.F.R. § 404.1529 (requiring that in determining whether a claimant is disabled the Commissioner will consider all symptoms, including pain, and the extent to which the claimant's symptoms "can reasonably be accepted as consistent with the objective medical evidence").

Here, the ALJ did not address Franklin's testimony or the record evidence regarding her pain and its limitations.  The ALJ found that although Franklin's doctors prescribed Percocet "there is no evidence that the claimant has had significant pain management treatment."  (Tr. 28). Additionally, the ALJ discounted Franklin's testimony regarding the side effects of her medication by saying that "[t]here is no evidence that she ever complained of significant side effects from medication, or that her medications were changed or the dosage adjusted, because of medication side-effects."  (Tr. 28).  Finally, the ALJ concluded, without explanation, that "[b]ased on the evidence as a whole, the claimant's subjective complaints, with regard to her condition prior to January 2003, are not reasonably supported by the objective evidence of record, and are not fully credible."  (Tr. 29).

The ALJ's finding that Franklin did not have severe pain requiring aggressive pain management is not supported by substantial evidence.  The record demonstrates that Franklin experienced constant pain from the time her right shoulder was injured on October 27, 1998. Franklin began talking Percocet after her surgery in July 1999 and remained on Percocet

-15-

consistently after her third surgery in October 2000.  Franklin's treating physician constantly noted pain in her right shoulder.  Objectively, this pain was explained by the need for three separate surgical interventions to repair the shoulder.  Franklin was  also given an injection and six Medrol Dosepak's in an attempt to alleviate her pain.  Dr. Most-Levin diagnosed Franklin as having chronic pain syndrome.  Thus, the record only permits a finding that Franklin suffered from pain in her right shoulder since her onset date and that this pain was reasonably consistent with the objective medical evidence and treatment practices of her treating physicians.

Also, the ALJ's conclusion that Franklin's description of the side effects from her medication was not credible is not supported by substantial evidence.  Franklin's treating physician, Dr. Dearolf explained that Franklin's medication affected her ability to concentrate and perform necessary job functions.  The record demonstrates that Percocet significantly helped Franklin deal with constant pain in her right shoulder and that the medication's positive effects outweighed any negative side effects she might suffer.  Her treating physician was all aware of the side effects, but continued to prescribe it as the medicine of choice because of her shoulder condition.

The record demonstrates that Franklin suffered severe pain requiring aggressive pain management.  The ALJ failed to adequately consider Franklin's testimony regarding her pain or the medical evidence submitted by her treating physicians and the ALJ failed to provide reasons for the rejection of such evidence.  Given Franklin's testimony and that of her treating physicians, the only substantial evidence is that Franklin was disabled since October 1998 due to pain which significantly limited her ability to engage in gainful employment.

C.      The ALJ Failed in its Duty to Fairly Consider the Evidence of Franklin's
        Depression

It is incumbent on an ALJ to give fair consideration to the entire record and to fully

explore all issues raised by the claimant.  See Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981);

20 C.F.R. § 404.944.  The Appeals Council in this case found that the previous record was

insufficient regarding Franklin's anxiety and depression and that the ALJ failed to evaluate the

evidence according to 20 C.F.R. § 1520a.  (Tr. 54).  The Appeals Council instructed that upon

remand the ALJ was to (1) obtain additional evidence, including a possible consultative

psychological examination, concerning Franklin's anxiety and depression; (2) evaluate Franklin's

mental impairment in accordance with the special technique outlined in 20 C.F.R. § 1520a with

sufficient documentation of the application of the technique and the ALJ's reasoning and

rationale; and (3) employ the use of a vocational expert to assess the limitations posed by

Franklin's alleged mental impairments.  (Tr. 55).  Despite these instructions, the ALJ did not

consider the evidence submitted by Franklin regarding her depression or seek the assistance of

further medical professionals in assessing Franklin's mental limitations.

Indeed, the ALJ stated that her opinion of Franklin's mental impairments was unchanged

since the first decision.  During the March 2004 hearing the ALJ told Franklin's attorney that if

Franklin wanted to amend her application to an alleged onset date of January 14, 2003 the

hearing could end because "[i]f you want to go earlier than that we're going to have a lot of

problems because I don't see where my opinion changed before that date."  (Tr. 603).  The ALJ

appeared to have made up her mind regarding Franklin's impairment before hearing her

testimony.  She remarked, "Your case, counsel, I told you what my, my view of the objective

medical record shows." (Tr. 604).

After providing a more detailed overview of the record evidence regarding Franklin's mental impairments, the ALJ concluded that Franklin's impairments were not severe and that her impairments did not meet a Listing under 12.04. In reaching this conclusion, the ALJ penalized Franklin for not having seen a psychiatrist or psychologist for treatment and for preferring, instead, to continue receiving anti-depressant medication and mental counseling from her family physician. (Tr. 26). The ALJ's decision to penalize Franklin in this manner is problematic in a number of respects.

First, in order for a claimant to lose entitlement benefits for refusing to follow a prescribed treatment, the refusal must be willful and without a justifiable excuse. Mendez v. Chater, 943 F. Supp. 503, 508 (E.D. Pa. 1996); Sharp v. Bowen, 705 F. Supp. 1111, 1123 (W.D. Pa. 1989); 20 C.F.R. § 404.1530. Furthermore, the claimant may only lose entitlements if the prescribed treatment would have restored her ability to work. 20 C.F.R. § 404.1530(a). Here, the ALJ penalized Franklin for not following Dr. Most-Levin's suggestion that she seek professional psychological counseling. However, in reaching this decision the ALJ failed to consider what practical effect, if any, Franklin's use of a separate psychological counselor would have had on her ability to return to work and ignored Franklin's own reasoning for preferring Dr. Most-Levin's continued treatment and counsel. There is no medical evidence that a psychologist or psychiatrist would have proceeded differently from Dr. Most-Levin.

The Regulations require that when reviewing a claimant's refusal to follow prescribed treatment, the claimant's physical and mental limitations are to be considered when assessing the claimant's reasons for denying treatment. 20 C.F.R. § 404.1530(c). Franklin was very clear,

both in the treatment record and during her testimony that she felt comfortable speaking with Dr. Most-Levin and that she was concerned about starting over with someone new.  This "fear" may well be consistent with a medical need as opposed to a decided lack of diligence.  In any event, the record is clear that Dr. Most-Levin, a medical professional whose credentials are not questioned, provided both medication treatment and counseling to Franklin during the course of their relationship.  Taking together Franklin's reasons for not being amenable to seeing a different psychological provider and the lack of proof that such specialized treatment would have restored Franklin's ability to work, Franklin should not have been penalized for her decision to remain under the care of Dr. Most-Levin.

Further, the ALJ failed to consider that Franklin's refusal to see another professional may have been a result of her depression.  Persons experiencing mental difficulties may have trouble following directions or making normal decisions regarding the best course of treatment.  The record shows that Franklin was struggling with depression during the dates at issue and that she had a history of mental frailty shown by the hospitalization in the 1980's.

In assessing Franklin's mental impairments, the ALJ also did not give appropriate weight to the opinions and determinations of Franklin's treating physicians.  It is a "cardinal principle guiding disability eligibility determinations [] that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (citing Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)).  See also 20 C.F.R. § 404.1527.  The third circuit has "consistently held that it is improper for an ALJ to credit the testimony of a consulting physician who has not examined the claimant when such

testimony conflicts with testimony of the claimant's treating physician." Dorf v. Bowen, 794

F.2d 896, 901 (3d Cir. 1986).  Here, the ALJ credited the findings of a non-examining state

agency psychologist who opined on August 28, 2000 that Franklin did not have a medically

determined psychological impairment.  (Tr. 26).  The psychologist, Thomas E. Fink, Ph.D.,

completed a Psychological Review Technique Form.  (Tr. 368).  In completing this form the only

box that was checked was the representation that Franklin had "No Medically Determinable

Psychological Impairment."  Dr. Fink provided no explanation for this representation and did not

complete any other portion of the form, including the assessment under the "B" Criteria of the

Listings.  The third circuit has held that "[f]orm reports in which a physician's obligation is only

to check a box or fill in a blank are weak evidence at best" and that "where these so-called

'reports are unaccompanied by thorough written reports, their reliability is suspect.'" Mason, 994

F.2d at 1065 (quoting Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986)).  Furthermore, the

third circuit has held that "there must be competent evidence in the record to support the

conclusions recorded on the form and the ALJ must discuss in his opinion the evidence he

considered in reaching the conclusions expressed in the form."  Woody v. Sec'y of Health &

Human Serv., 859 F.2d 1156, 1159 (3d Cir. 1988).

        In reaching the conclusion that Franklin's depression was neither severe nor met a listing

requirement, the only evidence that the ALJ had that was, in the least, contrary to the findings of

Franklin's treating physician was the form report from the non-examining state psychologist.

That psychologist did not provide a detailed description of the reasoning for his finding that

Franklin was not impaired.  Therefore, the ALJ had no reliable competent evidence that

contradicted the findings of Dr. Most-Levin.  Dr. Most-Levin's findings regarding Franklin's

depression and its effect on her daily life should have, as a matter of law, been given controlling weight.  Moreover, Dr. Most-Levin's opinion should have been accorded controlling weight given the fact that Dr. Most-Levin is a licensed, medical professional and the reviewing psychologist was not a medical professional.

## VI.    Conclusion

For the foregoing reasons,[1] Franklin's Motion for Summary Judgment is granted and the Commissioner's Motion for Summary Judgment is denied.

An appropriate Order follows.

---

[1]  Although the court finds that the ALJ's determination that Franklin's diverticulitis was not severe is supported by substantial evidence, in view of the foregoing that Franklin was disabled it does not change the outcome of this matter.  During the relevant time period Franklin exhibited times of abdominal cramping which, given her history of diverticulitis, always raised the question whether the diverticulitis had returned.  However, the record is void of any evidence that Franklin experienced diverticulitis "which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505; 20 C.F.R. § 416.905.  Furthermore, there was no testimony by Franklin or from Dr. Most-Levin regarding the effect of Franklin's diverticulitis on her ability to work.